UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 07-30866 (LMW) |
| | ) | | |
| SUSAN NORA BANNER, | ) | CHAPTER | 7 |
| | ) | | |
| DEBTOR. | ) | DOC. I.D. NOS. | 15, 21, 32, 80, 85, 88 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE CADLE COMPANY,                    )
                                      )
          MOVANT                      )
                                      )
     vs.                              )
                                      )
SUSAN NORA BANNER and                 )
ROBERTA NAPOLITANO, CHAPTER           )
7 TRUSTEE,                            )
                                      )
          RESPONDENTS.                )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SUSAN NORA BANNER,                    )
                                      )
          MOVANT                      )
                                      )
     vs.                              )
                                      )
THE CADLE COMPANY, FIRST              )
DEPOSIT NATIONAL BANK and )
MOODUS LUMBER AND COAL CO.            )
                                      )
          RESPONDENTS.                )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## **APPEARANCES**

Patrick W. Boatman, Esq.                Attorney for the Debtor
Law Offices of Patrick W.
  Boatman, LLC
111 Founders Plaza
Suite 1000
East Hartford, CT 06108

C. Donald Neville, Esq.                          Attorney for The Cadle Company
Kroll, McNamara, Evans,
 Delehanty, LLP
29 South Main Street
West Hartford, CT 06107


Denise Mondell, Esq.                             Attorney for the Attorney General of the
Assistant Attorney General                        State of Connecticut
55 Elm Street, 4th Floor
P.O. Box 120
Hartford, CT 06141-0120


Robert Napolitano, Esq.                          Chapter 7 Trustee
350 Fairfield Avenue
Bridgeport, CT 06601


Holley Claiborn, Esq.                            Attorney for the United States Trustee
Office of the U.S. Trustee
Giamo Federal Building
150 Church Street, Room 302
New Haven, CT 06510


## <u>MEMORANDUM OF DECISION AND ORDER</u>

Lorraine Murphy Weil, United States Bankruptcy Judge


Before the court are the following matters (collectively, the "Matters"): (1) The Cadle

Company's ("Cadle") motion for relief from stay (Doc. I.D. No. 15, the "R/S Motion");[1] (2) the

above-referenced debtor's (the "Debtor') objection to the R/S Motion (Doc. I.D. No. 21, the "R/S

Objection"); (3) Cadle's objection to the Debtor's claim of exemption with respect to her interest

in her residence (Doc. I.D. No. 32, the "Exemption Objection"); (4) the Debtor's amended motion

under Bankruptcy Code § 522(f)(1) (Doc. I.D. No. 85, the "Section 522(f) Motion"); (5) the State

---

[1]        References herein to the docket of this chapter 7 case are in the following form:
"Doc. I.D. No. __."

of Connecticut's (the "State") objection to the Section 522(f) Motion (Doc. I.D. No. 80, the "State's

Section 522(f) Objection")[2] and (6) Cadle's objection to the Section 522(f) Motion (Doc. I.D. No.

88, the "Section 522(f) Objection.")  The Court has jurisdiction over the Matters as core proceedings

under 28 U.S.C. §§ 1334 and 157 and that certain order dated September 21, 1984 of the District

Court (Daly, C.J.).[3]  This memorandum constitutes the findings of fact and conclusions of law

required by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.

## I.    **BACKGROUND**

The Debtor commenced this chapter 7 case by petition filed on April 19, 2007.  (*See* Doc.

I.D. No. 1.)  Filed with that petition were the Debtor's bankruptcy schedules.  (*See id.*)  On Schedule

A (Real Property) the Debtor lists a "Fee Owner - 50%" interest (the "Tenancy in Common") in her

residence in Moodus, Connecticut (the "Property").   In her Schedule C (Property Claimed as

Exempt) the Debtor claims a homestead exemption under Conn. Gen. Stat. § 52-352b(t) and

11 U.S.C. § 522(b)(3) with respect to the Tenancy in Common.   In her Schedule D (Creditors

Holding Secured Claims), the Debtor values the Tenancy in Common at $75,000.00 and lists the

following liens and mortgages against it:

•    Judgment Lien (the "Judgment Lien") in the amount of $362,557.00 held by

     Cadle and recorded on November 13, 1996;[4]

---

[2]    The State's Section 522(f) Objection actually refers to a prior version of the Section
522(f) Motion but is deemed to refer to the amended motion.

[3]    That order referred to the "Bankruptcy Judges for this District" *inter alia* "all
proceedings arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . . ."

[4]    The Judgment Lien is listed as a "disputed" claim.  To the extent (if any) that the
foregoing was not an allusion to a contemplated Section 522(f) motion, that initial position has not
been pursued by the Debtor and is deemed abandoned.

- Home Equity Credit Line Mortgage held by Liberty Bank with a balance of $10,059.37; and

- Home Equity Loan Mortgage held by Liberty Bank with a balance of $53,026.08.[5]

Cadle filed the R/S Motion on May 25, 2007 seeking relief from stay to foreclose the Judgment Lien. (*See* Doc. I.D. No. 15.) The Debtor filed the R/S Objection on June 12, 2007. The R/S Objection asserted that the Debtor intended to seek to avoid the Judgment Lien pursuant to Bankruptcy Code § 522(f)(1). The Debtor argued that the Effective Date Provision (as hereafter defined) which (on its face) rendered the Homestead Exemption (as hereafter defined) unavailable to the Debtor as against Cadle was itself inapplicable to the debt (the "Judgment Debt") underlying the Judgment Lien because the Effective Date Provision was preempted by Bankruptcy Code § 522(c) (the "Preemption Issue"). (*See* R/S Objection.) By order entered on June 15, 2007, the court continued the automatic stay in respect of the Tenancy in Common to June 25, 2007 (the date for a scheduled evidentiary hearing) subject to the condition that prior to such date the Debtor had filed a motion to avoid the Judgment Lien pursuant to Bankruptcy Code § 522(f)(1). (*See* Doc. I.D. No. 23.)

The Debtor filed an initial motion under Section 522(f)(1) on June 20, 2007. (*See* Doc. I.D. No. 26.) On June 25, 2007, in response to the parties' request that the scheduled hearing be further continued and also include the then pending Section 522(f)(1) motion, the court entered an order

---

[5]     The two Liberty Bank mortgages are hereafter referred to collectively as the "Liberty Bank Mortgages." Schedule D indicates that there is a co-debtor with respect to each such mortgage (*i.e.,* Arthur Lamme, as will appear from the discussion below). (*See* Doc. I.D. No. 1 (Schedule H. Co-Debtors).)

directing that "the automatic stay in respect of the Property remain in effect until further order of the

court." (Doc. I.D. No. 33.)  The combined hearing thereafter was continued from time to time.  The

Debtor received her chapter 7 discharge on August 1, 2007.  (*See* Doc. I.D. No. 45.)

Cadle filed the Exemption Objection on June 25, 2007.  The Exemption Objection argued

that the Homestead Exemption could not be asserted against Cadle because the Judgment Debt was

incurred prior to October 1, 1993 (*i.e.*, the effective date of the Homestead Exemption set forth in

the Effective Date Provision).  (*See* Doc. I.D. No. 32.)  As noted above, it is the Debtor's position

that  the  Effective  Date Provision is unenforceable because it  is preempted by Bankruptcy Code

§ 522(c).  At the suggestion of the court (perhaps proceeding out of an overabundance of caution),

the Debtor served a Notice of Potential Claim of Unconstitutionality to give the State an opportunity

to intervene in this case to take a position on the Preemption Issue.  (*See* Doc. I.D. No. 60.)  The

State intervened on October 18, 2007 and filed the State's Section 522(f) Objection on November

1, 2007 asserting that the Effective Date Provision is not preempted by Section 522(c).  (*See* Doc.

I.D. Nos. 74, 80.)  The Section 522(f) Motion was filed on November 20, 2007.  (*See* Doc. I.D. No.

85.)  The Section 522(f) Motion was stated in two counts:

- Count One ("Count One") sought to avoid the Judgment Lien pursuant to
  Section 522(f)(1) and the (state law) Homestead Exemption; and

- Count Two ("Count Two") sought to avoid the Judgment Lien pursuant to
  Section 522(f)(1) and the federal "homestead exemption" under Bankruptcy
  Code § 522(d)(1).[6]

---

[6]      The Debtor stated that she intended to amend her exemptions to elect the Federal List
(as defined below) rather than the Nonfederal List (as defined below) if she failed to prevail on the
Preemption Issue.  (*See* Doc. I.D. No. 85 (Count Two).)  Although First Deposit National Bank is

(*See* Doc. I.D. No. 85.)

The Section 522(f) Objection was filed by Cadle on November 29, 2007.  (*See* Doc. I.D. No. 88.)  In the Section 522(f) Objection, Cadle asserted (among other things): (a) the Debtor could not prevail on Count One because she could not prevail on the Preemption Issue; (b) the Debtor could not prevail on either Count One or Count Two because the Judgment Lien attached before the Debtor obtained her current interest in the Property (*i.e.*, the Tenancy in Common) and (c) the Debtor could not prevail on Count Two because it was too late in the proceeding for the Debtor to change her exemption election from the Nonfederal List to the Federal List.  (*See* Doc. I.D. No. 88.)

Cadle and the Debtor entered into an evidentiary stipulation which was docketed on November 29, 2007.  (*See* Doc. I.D. No. 90, the "Stipulation.")  An evidentiary hearing (the "Hearing") on the Matters was held on November 30, 2007.[7] At the Hearing, both testimonial and documentary evidence were introduced into the record.[8]  The Matters have been briefed fully (including by the State solely with respect to the Preemption Issue) and oral argument (at which the State participated) was had on June 2, 2008.  The Matters now are ripe for decision.

---

listed in the caption of the Section 522(f) Motion, that motion does not otherwise allude to that entity or seek relief against it.  (*See* Doc. I.D. No. 85.)  The Section 522(f) Motion does seek relief against Moodus Lumber and Coal Co. ("Moodus").  However, it appears that Moodus was dissolved on or about March 5, 1991.  (*See* Stipulation (as defined below) ¶ 30.)

[7]     A transcript (the "Transcript") of the Hearing appears in the record as Doc. I.D. No. 100.

[8]     All exhibits were stipulated to (*see* Doc. I.D. No. 90) and hereafter are referred to in the following form: "Exhibit __."

## II.    FACTS

The Debtor first obtained an interest in the Property in fee simple in 1974.  (*See* Exhibit G.)

By deed dated and recorded June 4, 1975, the Debtor conveyed her interest in the Property to herself

and her then-husband, James Shonty, as joint tenants with right of survivorship (collectively, the

"Joint Tenancies," and individually as to the Debtor, the "Joint Tenancy").  (*See* Exhibit H.)  On

December 2, 1986, the Debtor and James Shonty borrowed the sum of $70,000.00 from The

Connecticut Bank and Trust Company, N.A. ("CBT") and secured the repayment of said loan by a

mortgage (the "CBT Mortgage") on the Joint Tenancies.  (*See* Stipulation ¶ 27; Exhibit CC.)  At

some point in 1984, the Debtor and James Shonty separated and he moved out of the Property.  (*See*

Transcript at 14 (testimony of the Debtor).)  In 1987, Arthur Lamme and the Debtor became

romantically involved and he started living at the Property with the Debtor.  (*See* Transcript at 78

(testimony of Mr. Lamme).)  As of the Hearing date, the Debtor and Arthur Lamme were not married

to each other.  (*See* Transcript at 119 (testimony of Mr. Lamme).)

On or about February 18, 1991, the Debtor borrowed the sum of $25,000.00 from Merrow

Machine Employee Credit Union.  To secure the repayment of that loan, the Debtor executed a

Mortgage Deed encumbering the Joint Tenancy.[9]  The relevant Mortgage Deed dated February 18,

1991 was recorded on February 20, 1991 in the East Haddam Land Records.  (*See* Stipulation ¶ 28;

Exhibit DD.)  In 1992, Arthur Lamme started paying the CBT Mortgage.  In addition, from and after

---

[9]        By statute in Connecticut, a joint tenancy with right of survivorship is more durable
than at common law.  *See* Conn. Gen. Stat. §§ 47-14e, 47-14f.  In any event, the Debtor does not
contest that the interest in the Property conveyed by the Debtor pursuant to the 2004 Conveyance (as
hereafter defined) was other than a joint tenancy with right of survivorship.

1992 Arthur Lamme made sporadic payments against the Merrow Machine Employee Credit Union mortgage.  (*See* Exhibit F.)

On or about June 29, 1992, a predecessor in interest of Cadle obtained the judgment (the "Judgment") relevant to the Judgment Debt against the Debtor and James Shonty (among others) in the amount of $146,487.63.  (*See* Stipulation ¶ 1.)  The Judgment was assigned to Cadle which now is entitled to enforce it.  (*Id.* ¶¶ 2-3.)  On or about November 13, 1996, Cadle recorded the Judgment Lien against the Joint Tenancy.  (*Id.* ¶ 4.)[10]  As of November 13, 1996, the Judgment Lien was perfected against the Joint Tenancy and constituted a valid lien against that interest.  (*Id.* ¶ 5.)  The Debtor and Mr. Shonty divorced in or around 1996.  (*See* Transcript at 189 (testimony of Mr. Shonty).)[11]

In contemplation of some sort of a refinancing of the extant secured debt in respect of the Property, Arthur Lamme and the Debtor went to see Attorney John Cotter of Norwich, Connecticut in or about May, 2004.  (Transcript at 18 (testimony of the Debtor).)  The Debtor and Arthur Lamme claim that they advised Attorney Cotter of the existence of the Judgment and also made him aware of the possible existence of the Judgment Lien.  (*See* Transcript at 19, 31-33 (testimony of the Debtor); Transcript at 93, 96 (testimony of Mr. Lamme).)  Attorney Cotter claims that he was not so advised.  (*See* Exhibit AA at 69 (testimony of Attorney Cotter).)[12]  Attorney Cotter obtained a

---

[10]    Cadle also recorded a judgment lien against James Shonty's interest in a certain condominium.  (*See* Exhibit KK.)  It is unclear why Cadle did not record the Judgment Lien against Mr. Shonty's interest in the Property.

[11]    Neither party has suggested that title to the Property was affected by the divorce in any way.

[12]    Exhibit AA is a transcript of Cadle's October 16, 2007 deposition of Attorney Cotter which was admitted as a full exhibit by agreement.  (*See* Stipulation, part II.AA.)

title search (the "Title Search") with respect to the Property from Chicago Title Insurance Company. The Title Search did not disclose the Judgment Lien on the Joint Tenancy in favor of Cadle. (*See* Exhibit GG.) No one questioned Chicago Title Insurance Company with respect to the absence of the Judgment Lien from the Title Search. (*See* Exhibit AA at 62-63 (testimony of Attorney Cotter).) However, the court finds that the Debtor and Arthur Lamme then were aware of the Judgment and the (supposedly unrecorded) Judgment Lien. (*See* Transcript at 19 (testimony of the Debtor); Transcript at 93 (testimony of Mr. Lamme).)[13] For whatever reason, the Debtor did not consider a bankruptcy filing at that time. (*See* Transcript at 32 (testimony of the Debtor).) In any event, in September of 2004 the Debtor and James Shonty quitclaimed their interests in the Property to Arthur Lamme (*see* Exhibit I) who then granted a life interest in the Property to the Debtor (*see* Exhibit N) (collectively, the "2004 Conveyance"). By operation of law, the 2004 Conveyance from the Debtor to Arthur Lamme was subject to the Judgment Lien. In connection with the 2004 Conveyance, Arthur Lamme executed a will devising the Property to the Debtor in the event of his death. (*See* Exhibit M.) Thereafter, Arthur Lamme and the Debtor obtained new financing on the Property from Liberty Bank in the form of the Liberty Bank Mortgages. (*See* Exhibits Q and V.)[14]

Sometime in late 2005 or early 2006, a representative of Cadle contacted the Debtor and demanded payment of the Judgment Debt. (*See* Transcript at 33 (testimony of the Debtor).) The Debtor shared this information with Arthur Lamme who thereafter contacted Attorney Cotter. (*See*

---

[13] The court is persuaded that the Debtor and Arthur Lamme did not believe that the absence of the Judgment Lien from the Title Search meant that the Judgment and/or the Judgment Lien had (in some sense) "gone away."

[14] The title search Liberty Bank performed or had performed in connection with the Liberty Bank Mortgages may have been in the form of a "bring down" or updating of the defective Title Search. (*Cf.* Exhibit HH.)

*id.* at 114 (testimony of Mr. Lamme).)  In January 2006, Attorney Cotter arranged for a second title search with respect to the Property that disclosed the existence of the Judgment Lien against the Joint Tenancy.  (*See* Exhibit AA at 54 (testimony of Attorney Cotter).)  Attorney Cotter reported that information to the Debtor and Arthur Lamme.  (*See* Transcript at 116 (testimony of Mr. Lamme).)  In or about August of 2006, Cadle commenced proceedings to foreclose the Judgment Lien.  (*See* Exhibit W.)

In March of 2007 and after learning that the Judgment Lien on the Joint Tenancy was of record, Arthur Lamme deeded (the "2007 Conveyance") one-half of his interest in the Property back to the Debtor as tenant in common (*i.e.,* the Tenancy in Common).  (*See* Exhibit J.)  By operation of law, the conveyance from Arthur Lamme to the Debtor was subject to the Judgment Lien.  As recited in that quit claim deed, the purpose of the transaction was to restore to the Debtor her one-half interest in the Property as if the 2004 Conveyance never had taken place.  *Id.* The 2007 Conveyance was undertaken in contemplation of the commencement of this case.  (*See* Stipulation ¶¶ 15, 23.)

At the time of the commencement of this bankruptcy case, the Tenancy in Common represented the Debtor's entire interest in the Property.  (*See* Doc. I.D. No. 1 (Schedule A.  Real Property).)  At that time, the Property itself had a fair market value of $139,000.00 (*see* Stipulation ¶ 22) and the amount of the Judgment Lien was no less than $175,000.00 (*see* Stipulation ¶¶ 20, 21). The parties stipulate that, at the time of the commencement of this case, the Property was encumbered by the Liberty Bank Mortgages in the approximate aggregate amount of $62,828.60. (*See* Stipulation ¶ 31.)  The parties further stipulate that, at the time of the commencement of this case, the Property was encumbered by a statutory lien in favor of the Town of East Haddam for real

- 10 -

estate taxes in the amount of $2,175.08.  (*See* Stipulation ¶¶ 33, 34.)  At the time the Debtor filed

her voluntary chapter 7 petition, the Tenancy in Common was encumbered by the following judicial

liens:

   (a)    a judgment lien in favor of Moodus in the original amount of $583.48,

recorded at Volume 284, Page 107 of the East Haddam Land Records; and

   (b)    the Judgment Lien.[15]

(*See* Stipulation ¶¶ 5, 29.)

III.    **ANALYSIS**

   A.    **Bankruptcy Code § 522**

      1.    **Sections 522(b), (c)**

Under the Bankruptcy Act of 1898 (as amended from time to time), the only exemptions

available to individual debtors in bankruptcy were those available under applicable nonbankruptcy

law  (the "Nonfederal List").  *See*  4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy*

¶ 522.LH[1] (15 ed. rev. 2007).  The Bankruptcy Reform Act of 1978 changed the law by creating

a "federal" list (the "Federal List") of exemptions available only in bankruptcy which an individual

debtor could claim as an alternative to the Nonfederal List. (*See* 11 U.S.C. §§ 522(b), (d).)  However,

out of deference to the "traditional state legislative prerogative" (*Davis v. Davis (In re Davis),* 170

F.3d 475, 478 (5th Cir. 1999)) in the area of exemptions (and as a political compromise), Congress

gave each state the right to "opt out" of the Federal List, leaving its residents the sole option of the

---

[15]    The Section 522(f) Motion refers to an attachment lien in favor of Cadle.  (*See* Doc.
I.D. No. 85 ¶ 19(a).)  The recording information given therein for that alleged lien is not the same
as the recording information for the Judgment Lien.  In any event, the foregoing makes no difference
to the result reached below.

Nonfederal List.  *See* 11 U.S.C. § 522(b); *see also Davis*.  Although about 38 states are "opt out"

states, Connecticut is not one of them.  However, as noted above, in this case the Debtor has elected

the Nonfederal List (but has evinced the intent to elect the Federal List should she not prevail on the

Preemption Issue).

The effect of an exemption is twofold.  First, the exempted property is removed from the

estate and is not distributable to unsecured creditors in bankruptcy.  *See* 11 U.S.C. § 522(b).  Second,

to the extent set forth in Section 522(c), the exempt property is placed beyond the reach of the

debtor's prepetition creditors outside of bankruptcy.  Section 522(c) provides as follows:

> (c) Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case, except–
>    (1) a debt of a kind specified in paragraph (1) or (5) of section 523(a) (in which case, notwithstanding any provision of applicable nonbankruptcy law to the contrary, such property shall be liable for a debt of a kind specified in section 523(a)(5));
>    (2) a debt secured by a lien that is–
>        (A)(i) not avoided under subsection (f) or (g) of this section or under section 544, 545, 547, 548, 549, or 724(a) of this title; and
>            (ii) not void under section 506(d) of this title; or
>        (B) a tax lien, notice of which is properly filed;
>     (3) a debt of a kind specified in section 523(a)(4) or 523(a)(6) of this title owed by an institution affiliated party of an insured depository institution to a Federal depository institutions regulatory agency acting in its capacity as conservator, receiver, or liquidating agent for such institution; or
>     (4) a debt in connection with fraud in the obtaining or providing of any scholarship, grant, loan, tuition, discount, award, or other financial assistance for purposes of financing an education at an institution of higher education (as that term is defined in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001)).

11 U.S.C.A. § 522(c) (West 2008).[16]

---

[16]      Subparagraphs 1 through 4 (inclusive) hereafter are referred to as the "Section 522(c) Exceptions."

- 12 -

2.      **Section 522(f)**

Section 522(f) provides in relevant part as follows:

   (1) Notwithstanding any waiver of exemptions but subject to paragraph (3), the
debtor may avoid the fixing of a lien on an interest of the debtor in property to the
extent that such lien impairs an exemption to which the debtor would have been
entitled under subsection (b) of this section, if such lien is–
      (A) a judicial lien, other than a judicial lien that secures a debt of a kind that is
specified in section 523(a)(5) . . . .
   (2)(A) For the purposes of this subsection, a lien shall be considered to impair an
exemption to the extent that the sum of–
      (i)   the lien;
      (ii)  all other liens on the property; and
      (iii) the amount of the exemption that the debtor could claim if there were no
liens on the property;
exceeds the value that the debtor's interest in the property would have in the absence
of any liens . . . .

11 U.S.C.A. § 522(f) (West 2008).  "Impair[ment]" of an exemption within the purview of Section

522(f)(1) is determined by resort to the statutory formula set forth in Section 522(f)(2).  (*See, e.g.,*

*Trahan v. Day Kimball Hospital (In re Trahan)*, 337 B.R. 448 (Bankr. D. Conn. 2006) (Krechevsky,

J.).)  The effect of a successful Section 522(f) lien avoidance is to augment the universe of "exempt

. . . property" and "property exempted under this section" within the respective meanings of Sections

522(b) and 522(c).  *See In re VanZant,* 210 B.R. 1011 (Bankr. S.D. Ill. 1997).[17]

------

[17]      Section 522(f)(1)(A) allows a debtor to avoid or 'undo' the fixing of
a judicial lien on a debtor's interest in property if the lien impairs an
exemption to which the debtor would otherwise be entitled.  In this
way, the debtor can create equity in property encumbered by liens
prior to bankruptcy, and the equity, in turn, becomes part of the
bankruptcy estate to be exempted by the debtor.

*Id*. at 1013.

- 13 -

"Section 522(f) allows a debtor to 'avoid the fixing of a lien on an interest of the debtor in property.' In *Farrey* [*v. Sanderfoot,* 500 U.S. 291 (1991)], the Supreme Court construed this phrase to mean that the debtor must have 'possessed the interest to which the lien fixed, before it fixed.'" *Patriot Portfolio, LLC v. Weinstein (In re Weinstein),* 164 F.3d 677, 684 (1st Cir.), *cert. denied*, 527 U.S. 1036 (1999).  For Section 522(f) to apply, the debtor also must possess the relevant interest in the property as of the commencement of the bankruptcy case.  *See Weinstein,* 164 F.3d at 680.  The debtor bears the burden of proof by a preponderance of the evidence on every element of Section 522(f).  *See, e.g., In re Fox,* 353 B.R. 388, 393 (Bankr. D. Conn. 2006).[18]

### B.    Connecticut Homestead Exemption

Connecticut did not have a homestead exemption prior to October 1, 1993.  The Connecticut homestead exemption (the "Homestead Exemption") was first established by Connecticut Public Act 93-301 in 1993.  That act amended Section 52-352b of the Connecticut General Statutes in order to exempt "the homestead of the exemptioner to the value of seventy-five thousand dollars . . . provided value shall be determined as the fair market value of the real property less the amount of any statutory or consensual lien which encumbers it."  Conn. Gen. Stat. Ann. § 52-352b(t) (West 2008).[19]  The public act included a clause stating that it "shall take effect October 1, 1993, and shall be applicable to any lien for any obligation or claim [a "Pre-Existing Claim"] arising on or after said date."  1993 Conn. Pub. Acts 93-301, § 3 (the "Effective Date Provision").[20]

---

[18]    Outside of Section 522(f) proceedings, the party objecting to a Section 522 exemption bears the burden of proof on the issue.  *See* Fed. R. Bankr. P. 4003(c).  The Debtor does not prevail here even under the Rule 4003(b) standard of proof.

[19]    It is not disputed that the Property is the Debtor's statutory "homestead."

[20]    The Effective Date Provision was not codified in the Connecticut General Statutes.

- 14 -

Following the enactment of the Homestead Exemption, courts were faced with the task of construing the Effective Date Provision. The first bankruptcy case to address the issue was *In re Morzella*, 171 B.R. 485 (Bankr. D. Conn. 1994) (Krechevsky, J.). In *Morzella*, the creditor objected to the debtor's homestead exemption, arguing that his claim, arising from a personal injury sustained prior to October 1, 1993, was not subject to the exemption statute and thus could be satisfied from the debtor's interest in the residence without regard to the Homestead Exemption. *Morzella,* 171 B.R. at 486. In construing the Effective Date Provision, the court found that "[t]he most reasonable interpretation of this section is that the [a]ct applies to any prejudgment attachment or judgment lien placed on the exemptioner's residence for the purpose of collecting a debt incurred as a result of an obligation or claim arising on or after October 1, 1993." *Morzella,* 171 B.R. at 487 (internal citations omitted). The court noted that the legislative history, as well as two prior Connecticut state court decisions, supported the prospective approach. *Id.* Thus the court sustained the objection, holding that "even though a case is commenced after October 1, 1993, the homestead exemption may be claimed only as against claims that arose on or after that date, and not as to claims that arose before that date." *In re Duda*, 182 B.R. 662, 665 (Bankr. D. Conn. 1995) (Shiff, J.), *aff'd sub nom. Gernat v. Belford,* 192 B.R. 601 (D. Conn.), *aff'd,* 98 F.3d 729 (2d Cir. 1996) (paraphrasing *Morzella's* holding). *Accord Duda. See also, e.g., Caraglior v. World Sav. & Loan (In re Caraglior)*, 251 B.R. 778, 781 (Bankr. D. Conn. 2000) (Weil, J.) (same); *In re Ahmed*, 194 B.R. 540, 544 (Bankr. D. Conn. 1996) (Dabrowski, J.) (same); *National Loan Investors, L.P. v. Reale,* No. CV 980577024, 1998 WL 918797, at *3 (Conn. Super. Dec. 3, 1998) (same); *Carpenter v. Rand,* No. 543855, 1998 WL 165070, *2 (Conn. Super. April 2, 1998) (same).

Once it was determined that a debt was not subject to the Homestead Exemption, the question

of how to calculate the debtor's effective Homestead Exemption arose.  The *Morzella* court adopted

the methodology of two California bankruptcy court opinions and held that "the debtor is entitled

to the exemption amount allowed by the exemption statute in effect as of the commencement of the

case, minus the aggregate of all claims pre-dating the amendment . . . ."  *Morzella,* 171 B.R. at 489.

That method of calculating the amount of the Homestead Exemption was later adopted by the court

in *Duda*. *See id.*, 182 B.R. at 672 ("[The] exemption scheme accords fair treatment to debtors and

creditors, and is adopted.").

### C.    Relevant Supreme Court Authorities

The two leading cases construing Section 522(f) are *Owen v. Owen,* 500 U.S. 305 (1991),

and *Farrey v. Sanderfoot,* 500 U.S. 291 (1991).  Each is discussed below.

### 1.    *Owen v. Owen*

*Owen* dealt with the Florida homestead exemption which the Florida courts interpreted as

being inapplicable to pre-existing liens.  *Owen,* 500 U.S. at 307.  In *Owen* the debtor sought to avoid

such a pre-existing lien pursuant to Section 522(f).  The lien creditor objected to the debtor's motion

to avoid suggesting

> that to resolve this case, we need only ask whether the judicial lien impairs th[e]
> exemption.  It obviously does not [the creditor argued], since the Florida homestead
> exemption is not assertable against pre-existing judicial liens.  To permit avoidance
> of the lien [the creditor argued] . . . would not *preserve* the exemption but would
> *expand* it.

*Owen,* 500 U.S. at 309 (emphasis in original).

The Court rejected the creditor's argument based on a literal reading of Section 522(f).  The

Court held that the correct inquiry was not whether the actual lien impaired the exemption but,

- 16 -

rather, whether the lien impaired an exemption to which the debtor would have been entitled *but for the subject lien itself* (in other words, a hypothetical exemption rather than an actual exemption). *See Owen,* 500 U.S. at 310-14. The Court decided *Owen* strictly as a matter of construction of Section 522(f). Accordingly, in *Owen* the value of the lien was included in the debtor's exempt property not because the state limitation was preempted but, rather, because the debtor's exempt property was augmented by the Section 522(f) lien avoidance.[21]

### 2. *Farrey v. Sanderfoot*

In *Farrey v. Sanderfoot,* the Supreme Court held that "§ 522(f)(1) of the Bankruptcy Code requires a debtor to have possessed an interest to which a lien attached, before it attached, to avoid the fixing of the lien on that interest." *Farrey,* 500 U.S. at 301. In *Farrey,* a Wisconsin state court had entered a decision granting a judgment of divorce and property division. To ensure an equal division of property, the court ordered Mr. Sanderfoot to pay Ms. Farrey $29,208.44 in two installments. The same decree granted Mr. Sanderfoot sole title to the marital home (which previously had been owned by the parties jointly). To secure the monetary award to Ms. Farrey, the decree granted Ms. Farrey a lien on Mr. Sanderfoot's interest in the home. *Farrey,* 500 U.S. at 292-93.

Mr. Sanderfoot never made any payments pursuant to the decree and filed a petition under chapter 7 of the Bankruptcy Code. In his chapter 7 case, Mr. Sanderfoot listed the marital home as an asset and claimed his state law homestead exemption with respect to that property. Mr. Sanderfoot sought to avoid Ms. Farrey's lien pursuant to Bankruptcy Code § 522(f). The Bankruptcy

---

[21]     See discussion at part III.D.2, *infra.*

- 17 -

Court denied the motion.  On appeal, the District Court reversed and that judgment was affirmed by

United States Court of Appeals for the Seventh Circuit.  *Farrey,* 500 U.S. at 294-95.

On certiorari review, the Court reversed the Seventh Circuit, reasoning as follows:

What specific legislative history exists suggests that a principal reason Congress singled out judicial liens was because they are a device commonly used by creditors to defeat the protection bankruptcy law accords exempt property against debts.  As the House Report stated:

"The first right [§ 522(f)(1)] allows the debtor to undo the actions of creditors that bring legal action against the debtor shortly before bankruptcy . . . .  If a creditor beats the debtor into court, the debtor is nevertheless entitled to his exemptions."  H.R. Rep. No. 95-595 . . . at 126-127 . . . .

Conversely, the text, history, and purpose of § 522(f)(1) also indicate what the provision is *not* concerned with.  It cannot be concerned with liens that fixed on an interest before the debtor acquired that interest . . . .  Section 522(f)(1) does not state that any fixing of a lien may be avoided; instead, it permits avoidance of the "fixing of a lien on an interest of the debtor."  If the fixing took place before the debtor acquired that interest, the "fixing" by definition was not on the debtor's interest.  Nor could the statute apply given its purpose of preventing a creditor from beating the debtor to the courthouse, since the debtor at no point possessed the interest without the judicial lien.  There would be no fixing to avoid since the lien was already there.  To permit lien avoidance in these circumstances, in fact, would be to allow judicial lienholders to be defrauded through the conveyance of an unencumbered interest to a prospective debtor.

*Farrey,* 500 U.S. at 297-98.  Based upon the foregoing rationale, the Court concluded that because

Mr. Sanderfoot's previous interest in the home had been extinguished by the divorce decree and Mr.

Sanderfoot had not possessed his new fee simple interest before Ms. Farrey's lien "fixed,"

§ 522(f)(1) was not available to avoid the "fixing"of that lien.  *Farrey,* 500 U.S. at 299-300.[22]

---

[22]     The Court also concluded that Mr. Sanderfoot would not prevail even on an alternative analysis:

[I]t may be that . . . the divorce decree augmented Sanderfoot's previous interest by adding to it Farrey's prior interest.  If the court in exchange sought to protect Farrey's previous interest with a lien, § 522(f)(1) could be used to undo the encumbrance to

- 18 -

### D.      **Preemption Issue**

As noted above, the Debtor argues that the Effective Date Provision is preempted by Section

522(c) of the Bankruptcy Code and is ineffective to limit the Debtor's claimed Homestead

Exemption.  Some courts have held that a state law provision excluding the claim of a certain class

of creditors from the scope of a particular state law exemption is preempted by Section 522(c).  *See,*

*e.g., Weinstein,* 164 F.3d 677; *In re Skjetne,* 213 B.R. 274 (Bankr. D. Vt. 1997); *In re Scott,* 199 B.R.

586 (Bankr. E.D. Va. 1996).  Other courts (an apparent numerical minority although many of the

cases taking the *Weinstein* view have come from courts in the First Circuit) have held that such a

provision is not preempted.  *See, e.g., In re Ondras,* 846 F.2d 33 (7th Cir. 1988); *In re Norkus,* 256

B.R. 298 (Bankr. S.D. Iowa 2000); *In re Fishman,* 241 B.R. 568 (Bankr. N.D. Ill. 1999) (so holding

both pursuant to *Ondras* as binding authority and on independent grounds).  The issue (as thus

phrased) appears to be one of first impression for this district.  For the reasons discussed below, the

court concludes that Section 522(c) does not preempt the Effective Date Provision.

---

the extent the lien fastened to any portion of Sanderfoot's previous surviving interest.
This follows because Sanderfoot would have possessed the interest to which that part
of the lien fixed, before it fixed.

But in this case, the divorce court did not purport to encumber any part of
Sanderfoot's previous interest . . . .  The decree instead transferred Farrey's previous
interest to Sanderfoot and, again simultaneously, granted a lien equal to that interest
. . . .  Sanderfoot thus would still be unable to avoid the lien in this case since it
fastened only to what had been Farrey's pre-existing interest, and this interest
Sanderfoot would never have possessed without the lien already having fixed.

*Farrey,* 500 U.S. at 300.

### 1.    Standard for Preemption

The court adopts the following standard for preemption:

Preemption is a doctrine grounded in the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, which the Supreme Court has interpreted to provide that any state law conflicting with a valid federal law is "without effect." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).  To avoid "unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption[,] *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)[,] . . . [unless] such a result is the "clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citation omitted).  The "ultimate touchstone" of preemption analysis is the purpose of Congress.  *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608.

Preemption may be express or implied from the structure and purpose of a statute.[23] *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).  Implied preemption may be found in two ways.  The first type of implied preemption is field preemption, which occurs in cases where the federal regulatory scheme "is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  *Gade v. National Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (citation omitted).  The second type of implied preemption is conflict preemption.  Conflict preemption arises where (1) "compliance with both federal and state regulations is a physical impossibility" or (2) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade,* 505 U.S. at 98, 112 S.Ct. 2374 (citations omitted).

*Curtin v. Port Authority of New York and New Jersey*, 183 F. Supp. 2d 664, 667-68 (S.D.N.Y. 2002).

### 2.    Preemption Analysis

As an initial matter, the court notes that *Owen* is not directly applicable to this case.  As noted above, the Florida law at issue in *Owen* was *lien* specific.  Thus, if the lien had not existed, the Florida homestead exemption available to the debtor in *Owen* would have been increased (*i.e.,* there

---

[23]    The Debtor does not argue that express preemption applies but, rather, relies on the doctrine of implied preemption.

was a hypothetical exemption).  By way of contrast, the Effective Date Provision is *claim* specific.

Even if the Judgment Lien did not exist, the Homestead Exemption would still be reduced by the

amount of the Judgment Debt (*i.e.,* there would be no hypothetical exemption).  The Debtor does not

argue otherwise.  However, the Debtor does argue that she still can use Section 522(f)(1) to avoid

the fixing of the Judgment Lien because the Effective Date Provision is preempted by Section 522(c)

and is unenforceable here.  The Debtor relies on *Weinstein* and cases like it for the proposition that

because the Effective Date Provision "ha[s] the same effect on the [H]omestead [Exemption] as the

[Section 522(c) Exceptions], . . . the [Effective Date Provision] . . . is preempted to the extent that

it permits exempt property to be liable for debts other than those expressly enumerated in . . . [the

Section 522(c) Exceptions] . . . ," *Weinstein,* 164 F.3d at 683 (citation and internal quotation marks

omitted).  This court respectfully disagrees.

    *Weinstein* treats *Owen* as if *Owen* were an implied preemption case.  As noted above, *Owen*

was not an implied preemption case but, rather, dealt with the proper construction of Section

522(f)(1) (*i.e.,* its reference to a hypothetical exemption rather than to an actual exemption).  In

*Owen,* the Court noted that, in Section 522(f)(1) matters, courts uniformly applied the "hypothetical

exemption" rule to the Federal List. The creditor argued that, in Section 522(f)(1) matters, an "actual

exemption" (rather than a "hypothetical exemption") rule should apply to the Nonfederal List (or at

least to state law exemptions). The closest this court can find to preemption analysis in *Owen* is the

following passage which rejected the creditor's argument:

> Respondent asserts that it is inconsistent with the Bankruptcy Code's "opt-out"
> policy, whereby the States may define their own exemptions, to refuse to take those
> exemptions with all their built-in limitations.  That is plainly not true, however, since
> there is no doubt that a state exemption which purports to be available "unless
> waived" will be given full effect, *even if it has been waived,* for purposes of § 522(f)-

- 21 -

> the first phrase of which . . . recites that it applies "[n]otwithstanding any wavier of exemptions." Just as it is not inconsistent with the policy of permitting state-defined exemptions to have another policy disfavoring waiver of exemptions, whether federal-or state-created; so also it is not inconsistent to have a policy disfavoring the impingement of certain types of liens upon exemptions, whether federal or state created. We have no basis for pronouncing the opt-out policy absolute, but must apply it along with whatever other competing or limiting policies *the statute contains.*

*Owen,* 500 U.S. at 313 (second emphasis added). However, as noted above, this court reads *Owen* as a pure statutory construction case, not in any sense as a preemption case. *Accord In re Norkus,* 256 B.R. at 304 ("The *Weinstein* court . . . applies *Owen* too broadly."); *In re Fishman,* 241 B.R. at 573 n.1 ("*Weinstein* states that its holding is compelled by . . . *Owen v. Owen . . . .* However, *Owen* does not involve the situation presented by either *Weinstein* or the present case.").

Properly putting *Owen* to the side, this court's preemption analysis is as follows. As discussed above, in this case the Effective Date Provision determines the extent of the Homestead Exemption. By way of contrast, the Section 522(c) Exceptions make the entire concept of exempt property irrelevant to the claims enumerated therein (at least as a matter of bankruptcy law).[24] There is no tension between the two concepts. "[B]ecause § 522(c) only applies to exempt property, there is no conflict in recognizing that state law may render property nonexempt as to particular claims. As to such nonexempt property, § 522(c) never comes into effect." *In re Fishman,* 241 B.R. at 574.[25]

---

[24]    *Cf. Davis v. Davis,* 170 F.3d 475.

[25]    The court in *Morzella* directed that the amount of the reduction in the Homestead Exemption resulting from the application of the Effective Date Provision be distributed to Pre-Existing Claims. *See In re Morzella,* 171 B.R. at 489. It has been suggested that such a distribution scheme violates the general bankruptcy principle of equality of distribution. *See, e.g., Fishman,* 241 B.R. at 574; *In re Van Rye,* 179 B.R. 375, 378-79 (Bankr. D. Mass. 1995), *aff'd,* 96 F.3d 1430 (1st Cir. 1996). *See also In re Duda*, 182 B.R. at 672 n.14 (expressing some reservations). However, even if the *Morzella* distribution rule is wrong (and this court herein expresses no opinion on that point), the solution is for courts to adopt the appropriate distribution rule in bankruptcy rather than

- 22 -

Finally, a court must add to the preemption analysis the states' "traditional state legislative prerogative" in the area of exemptions and Congress' deference to the same expressed in Section 522's "opt-out" provision.[26]  Given all of the foregoing, this court is not persuaded that it was the "clear and manifest purpose of Congress," *Cipollone*, 505 U.S. at 516, to preempt state law such as the Effective Date Provision.  *Cf. Owen,* 500 U.S. at 308 ("Nothing in subsection [522](b) (or elsewhere in the Code) limits a State's power to restrict the scope of the exemptions."); *First Nat'l Bank of Mobile v. Norris,* 701 F.2d 902, 905 (11th Cir. 1983) ("[N]othing in section 522 suggests that the state cannot determine exemptions according to the date debts were incurred . . . ."); *Duda,* 182 B.R. at 671 (same, *citing Norris*)*.*  Accordingly, the Section 522(f) Motion will be denied as to Count One and the Section 522(f) Objection will be sustained as to Count One, and the State's Section 522(f) Objection (directed to the Preemption Issue only) will be sustained.  For the same reason, the Exemption Objection also will be sustained.

### E.    *Farrey v. Sanderfoot* **Issue**

This court previously has held that, under *Farrey v. Sanderfoot,* Section 522(f) cannot be used to avoid a lien if the debtor acquired the relevant property interest subject to that lien.  *See In re Bianchini,* 346 B.R. 593, 596 (Bankr. D. Conn. 2006) ("If the Debtor were to rely on the Second Deed, the Debtor could not prevail.  That is because the Second Deed conveyed title to the Property subject to the Lien.").  *Accord In re Remington,* 311 B.R. 315 (Bankr. D. Me. 2004).  However, this case presents an issue not presented in *Bianchini.*

-------------------------------------------------------------

to preempt the Effective Date Provision.

[26]      The Debtor conceded at oral argument that the fact that Connecticut has not "opted out" of the Federal List is irrelevant.

Cadle argues that the *Farrey v. Sanderfoot* analysis must be performed with respect to the interest that the Debtor owned in the Property as of the commencement of the case (*i.e.,* the Tenancy in Common). The Debtor argues that, provided the Debtor owned an interest in the Property as of the commencement of this case, the *Farrey v. Sanderfoot* analysis is performed on the interest the Debtor owned in the Property at the time the Judgment Lien attached (*i.e.,* the Joint Tenancy). An argument substantially similar to the Debtor's argument was rejected in *In re Jackaman,* No. 99-19029DWS, 2000 WL 192973 (Bankr. E.D. Pa. Feb. 15, 2000).

In *Jackaman,* the debtor had owned the subject property in fee simple when the target lien attached. Subsequently, the Debtor conveyed his fee simple interest to himself and his wife as tenants by the entireties and that was the state of title as of the commencement of the chapter 13 case. In denying the debtor's Section 522(f) motion, the court in *Jackaman* reasoned:

> Underlying the Supreme Court's decision [in *Farrey*] is the assumption that § 522(f) only entitles a debtor to avoid the fixing of a lien on the same interest to which it fixed. This conclusion is supported by the Supreme Court's last paragraph in *Farrey* which states:
>
> > We hold that § 522(f)(1) of the Bankruptcy Code requires a debtor to have possessed an interest to which a lien attached, before it attached, to avoid the fixing of the lien *on that interest.*
>
> 500 U.S. at 301 (emphasis added) . . . . [I]f a debtor no longer holds the interest to which the lien fixed, he cannot use § 522(f)(1) to avoid the lien. Here, the lien at issue fixed on Debtor's fee simple interest – not his tenant by the entireties interest. It is his tenant by the entireties interest (his current interest) in which he would be entitled to seek an exemption in the absence of the lien. Therefore, Debtor cannot use § 522(f)(1) to avoid the lien.

*Jackaman,* 2000 WL 192973, at *6. *See also McCormick v. Mid-State Bank and Trust Co. (In re McCormick)*, 18 B.R. 911 (Bankr. W.D. Pa.), *aff'd,* 22 B.R. 997 (W.D. Pa. 1982) (Section 522(f) motion denied where subject lien fixed to the debtor's tenancy by the entireties interest but the debtor

had acquired a fee simple interest in the subject property subject to the lien prior to bankruptcy pursuant to a conveyance from herself and her spouse as tenants by the entireties.); *Stephens v. Walter E. Heller Western, Ltd. (In re Stephens)*, 15 B.R. 485 (Bankr. W.D.N.C. 1981) (Section 522(f) motion denied where subject liens fixed to debtor's interest in property so that conveyance of the property to the debtor's brother was subject to those liens and the brother's subsequent reconveyance to the debtor prior to bankruptcy remained subject to the liens.) *Cf. Farrey v. Sanderfoot,* 500 U.S. at 299 (citing *McCormick* and *Stephens* with approval). *But see Saturley v. Casco Northern Bank, N.A. (In re Saturley),* 149 B.R. 245 (Bankr. D. Me. 1993) (reaching opposition conclusion in dicta; motion to avoid lien denied for the stated reason that the husband's "interest in the . . . real estate [had] no value [and therefore] the existence of the . . . judicial liens impair[ed] no exemption rights to which he would otherwise be entitled.").

The court finds the case against the Debtor to be not only more persuasive than the case against the debtor in *Jackaman* but also to be materially similar to the facts in *Stephens. Cf. id.,* 15 B.R. at 486 ("The debtor by transfer to his brother divested himself of all interest in the subject property, at a point in time at which the liens sought to be avoided had already attached. Thus when the debtor reobtained the property [three days prior to filing his chapter 7 petition] he did so subject to the judgment liens . . . . "). That is because the 2007 Conveyance was by a person other than the Debtor (*i.e.*, Arthur Lamme) to the Debtor in contemplation of bankruptcy which is the very situation decried by the Court in *Farrey v. Sanderfoot. See id.,* 500 U.S. at 298.[27] The Debtor took the

---

[27]      Whether the *Jackaman* rationale applies to the situation where the change in the debtor's interest in the subject property was effectuated by court order, operation of law or by the act of a third party (rather than by the debtor's own act, as here) is a question not now before the court. *Cf., e.g., Law Offices of Moore & Moore v. Stoneking (In re Stoneking),* 225 B.R. 690, 695 (B.A.P. 9th Cir. 1998); *In re Chandler,* 77 B.R. 513 (Bankr. E.D. Pa. 1987), *aff'd,* No. 87-6516, 1988

- 25 -

Tenancy in Common pursuant to the 2007 Conveyance subject to the Judgment Lien and, accordingly, Section 522(f)(1) cannot be used to avoid that lien.

The Debtor argues that the 2007 Conveyance effectively rescinded the 2004 Conveyance. The short answer to that argument is that is not what the 2007 Conveyance did.  To effectuate a deemed rescission (if such were possible), Arthur Lamme at least would have had to deed the Property to the Debtor and Mr. Shonty as joint tenants with right of survivorship.  Arthur Lamme did not do that but, rather, created the Tenancy in Common between the Debtor and himself, which did not restore the *status quo ante*.  *Cf.*  Conn. Gen. Stat. §§ 47-14a ("Joint tenancy in fee simple with survivorship"); 47-36a(a)(3) (definition of "joint tenants"); 47-36a(b)(2) (definition of "tenants in common").  Even if the court had the power in equity to rescue the Debtor from the consequences of the 2004 Conveyance (which the court assumes but does not decide), the court would not do so because the Debtor and Arthur Lamme were aware of the Judgment and the Judgment Lien (even if they erroneously believed the lien to have been unrecorded) when they entered into the 2004 Conveyance, and the 2004 Conveyance was their own free (even if misguided) act and deed.  Accordingly, the Section 522(f) Motion will be denied and the Section 522(f) Objection will be sustained as to both Count One and Count Two.[28]

### F.    <u>Relief from Stay</u>

The Tenancy in Common has a stipulated value of $69,500 (one half of $139,000).  The Judgment Debt is in the stipulated amount of no less than $175,000.  This is not a reorganization

---

WL 34921 (E.D. Pa. Mar. 31, 1988).

[28]    With respect to Count One, the foregoing is a separate and independent basis for denying the Section 522(f) Motion and sustaining the Section 522(f) Objection from the grounds set forth in part III.D, *supra.*

case.  This court holds above that the Debtor may not avoid the Judgment Lien pursuant to Section

522(f).  Accordingly, Cadle is entitled to relief from stay to enable it to foreclose the Judgment Lien

in accordance with state law (but not to pursue a deficiency claim against the Debtor).  *See* 11 U.S.C.

§§ 362(d)(2), 524.

IV.   **CONCLUSION**

    For the reasons discussed above, it hereby is **ORDERED** that

    A.    a separate order shall enter granting the R/S Motion (Doc. I.D. No. 15);

    B.    the R/S Objection (Doc. I.D. No. 21) is overruled;

    C.    the Exemption Objection (Doc. I.D. No. 32) is sustained;

    D.    the Section 522(f) Motion (Doc. I.D. No. 85) is denied in its entirety; *provided, however,* if within ten (10) days after entry of this order the Debtor requests in writing that an order enter granting relief against Moodus, an order granting such relief shall issue;[29]

    E.    the State's Section 522(f) Objection (Doc. I.D. No. 80) is sustained; and

---

[29]    In the absence of objection by Moodus, the court concludes that relief may be granted against Moodus pursuant to Section 522(f)(1).

F.      the Section 522(f) Objection (Doc. I.D. No. 88) is sustained.

Dated: August 27, 2008                                BY THE COURT

                                                      Lorraine Murphy Weil
                                                      United States Bankruptcy Judge